COURT OF APPEALS
DECISION
DATED AND FILED

December 15, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2019AP1384-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2015CF2561

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

   V.

JOSEPH L. HOWARD,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: ELLEN R. BROSTROM and JEFFREY A. WAGNER, Judges. *Order reversed and cause remanded with directions.*

Before Brash, P.J., Donald and White, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Joseph L. Howard appeals his judgment of conviction for second-degree intentional homicide, as a party to a crime, and felony bail-jumping. He also appeals the order denying his postconviction motion without an evidentiary hearing.[1] Howard argues that his trial counsel improperly conceded his guilt in the homicide over Howard's insistence that he was not present when the victim was killed, which is a structural error according to *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018). Howard further asserts that the trial court erred in denying his request for new counsel during the trial.

¶2 We conclude that Howard has pled sufficient facts in his postconviction motion to warrant an evidentiary hearing with regard to both whether his trial counsel's performance violated the principles set forth in *McCoy* and whether the trial court erred in its denial of his request for new counsel, specifically with regard to the disagreement between Howard and his trial counsel regarding the theory of defense as it relates to the principles of *McCoy*. We therefore reverse the order denying Howard's postconviction motion, and remand this case for further proceedings consistent with this decision.

## BACKGROUND

¶3 The charges against Howard stem from an incident that occurred in June 2015. Milwaukee Police Officers were dispatched to a residence on South 9th Street in Milwaukee, where they discovered a man—later identified as Vincent Howard, Howard's nephew—with multiple stab wounds lying on the living room floor. Vincent died from his injuries.

---

[1] While the appellant appeals both the judgment of conviction and the final order, we address only the order for the reasons set forth in this opinion.

¶4 After discovering Vincent, the officers searched the rest of the residence as a safety measure and discovered another victim—later identified as J.W., Howard's girlfriend—in a bedroom. One side of J.W.'s face was severely swollen and there was blood in her left ear, as well as a circle of blood on the bed coming from the area of her left hip. J.W. was taken to the hospital for treatment of her injuries.

¶5 Police interviewed Emanuel Howard, another nephew of Howard's, regarding the incident. Emanuel gave several statements in which he denied knowing who had killed Vincent and injured J.W.; however, he eventually told police that Howard had stabbed Vincent. Emanuel explained that he, Howard, and J.W. were smoking crack at the residence. When Vincent got there, he became angry because J.W. owed him money for crack, and he began beating her. Afterwards, Vincent tried to leave the residence, and in trying to keep Vincent from leaving, Howard grabbed a kitchen knife and stabbed him while Emanuel held him. Emanuel further stated that Howard chased Vincent into the living room and stabbed him several more times.

¶6 Emanuel stated that Howard then left the residence. Emanuel said that Vincent asked him to get help, but he did not do so because he was afraid he would be arrested. Emanuel further stated that Howard returned to the residence about an hour later and asked Emanuel to lie to the police about the incident so that they would not know that Howard was involved.[2]

¶7 Howard eventually made a custodial statement to police in which he admitted to stabbing Vincent. Howard said that he entered the apartment while

---

[2] Emanuel was charged with harboring or aiding a felon as a party to a crime, and misdemeanor bail jumping as a result of this incident.

Vincent was beating J.W. Howard stated that he jumped on Vincent to get him to stop beating J.W. Vincent pushed Howard off of him, at which time Howard grabbed a knife and stabbed Vincent twice. Howard also admitted to leaving the residence after the stabbing, and then returning with a man named Tom who told Howard he should clean up the blood, which Howard did.

¶8 The State subsequently amended the homicide charge against Howard to first-degree intentional homicide, as a party to a crime. The matter proceeded to trial in July 2016.[3]

¶9 On the first day of trial, prior to the start of *voir dire* of the jury panel, Howard's trial counsel addressed an issue with the trial court regarding his request for a jury instruction relating to the defense of others. Counsel sought to make a record that although he had previously requested this instruction, Howard "has maintained throughout that he was not present" when Vincent was stabbed, putting counsel in the "awkward position of perhaps taking a defense contrary to my client's position[.]" The court suggested—and the parties agreed—that a decision on appropriate jury instructions should come after the close of evidence at the end of the trial.

¶10 At the beginning of the second day of trial, Howard made a "small outburst" in court during which he announced that he "want[ed] another lawyer." Howard's trial counsel explained that Howard had indicated the day before that he wanted counsel to file a motion to suppress his custodial statement to police on the ground that the police had "tricked" him. Counsel stated that he had reviewed the

---

[3] The trial was held before the Honorable Ellen R. Brostrom, who also imposed Howard's sentence; we refer to her as the trial court. The postconviction motion was reviewed by the Honorable Jeffrey A. Wagner, as the successor to Judge Brostrom's calendar; we refer to him as the postconviction court.

recording of the interview multiple times, and further, that he had done "zealous legal research" on the issue of the "trickery" claimed by Howard, but had found no errors or evidence of misconduct on the part of the police. Thus, counsel believed that such a motion would be frivolous.

¶11 The trial court found that there was no legal basis for Howard's trial counsel to be relieved of his duties in this case. In fact, the court noted that counsel had demonstrated that he was well prepared for trial. The trial proceeded.

¶12 The State introduced the video recording of Howard's custodial statement to police. At the beginning of the interview, Howard denied any involvement in the incident. However, later during the interview, Howard admitted to being at the apartment when J.W. was beaten, and ultimately admitted to stabbing Vincent. Howard stated that Vincent "was acting like a gorilla and came at him," which was the reason Howard stabbed him.

¶13 Furthermore, when Howard was shown a picture during the interview of the knife used in the stabbing, Howard identified it as the knife he used to stab Vincent, which, afterwards, he put in the kitchen sink. Additionally, Howard stated that a white fleece jacket with blood on it that he was wearing when he was arrested had been taken from him by police detectives at an earlier interview.

¶14 Emanuel also testified for the State. He initially testified that he was not present when the incident took place, but rather was upstairs in his apartment with Howard and his father. However, Emanuel later admitted on the stand that he had lied about being upstairs during the incident to protect Howard, and that he had witnessed both Vincent beating J.W. and Howard stabbing Vincent.

¶15 J.W. testified that she had no recollection of the incident. However, the police detective who interviewed J.W. approximately two weeks after the incident testified that J.W. had told her that on the night of the incident, Vincent had come home to find J.W., Emanuel, and Howard smoking his crack, that he was angry about it, and that he began hitting her with a croquet mallet.

¶16 On the third day of trial, just before the State rested its case, the State inquired as to whether trial counsel was going to pursue his earlier request for the inclusion of jury instructions relating to self defense and lesser included crimes, because Howard had ordered that the request be withdrawn. In response, trial counsel conceded that he and Howard "have had an adverse position on this case all along." However, counsel noted that based on the evidence that had been introduced at that point—particularly, the video recording of Howard's custodial interview— he believed that those instructions would be appropriate, even though that put him "in an adverse position with [his] client."

¶17 Later that day, after the State rested, the trial court and the parties again discussed the issue of jury instructions. The court noted that the request for a jury instruction was one of trial strategy as opposed to a "decision of constitutional proportions," as is a defendant's decision on whether to testify. Moreover, the court stated that it has an obligation to use instructions it believes are appropriate, and could exercise its discretion *sua sponte* if it "felt like that was the right thing to do."

¶18 Trial counsel then indicated that Howard had decided not to testify and that he agreed with the inclusion of the jury instructions regarding self defense and defense of others. The trial court confirmed that during a colloquy with Howard, who agreed that he wanted the court "to use the jury instruction for

imperfect self defense or imperfect defense of others so the jury [could] consider the lesser included [charge of] second-degree intentional homicide[.]"

¶19    Trial counsel's closing argument focused on the self defense theory. He stated that Howard "did not wake up saying, I want to kill my nephew, the guy I live with." Counsel then reiterated the circumstances that had led to Vincent being stabbed, referring repeatedly to the video of Howard's statement to police:  that Vincent—a "young, strong man"—took a mallet to J.W.—"a defenseless woman"—beat her over a $200 drug debt, and that Howard—an "old drunk" who receives disability due to a previous injury—"snapp[ed] and stabb[ed]" Vincent after Vincent charged at Howard.  Counsel emphasized that Vincent had "caused the situation."

¶20    The jury convicted Howard of second-degree intentional homicide, as a party to a crime, as well as felony bail jumping.  The trial court imposed a sentence totaling thirty years, bifurcated as twenty years of initial confinement and ten years of extended supervision.

¶21    Howard filed a postconviction motion in August 2018.  He argued that trial counsel had committed a structural error in admitting to the jury that Howard had killed Vincent "despite Mr. Howard's insistence throughout trial counsel's representation that he was innocent and did not kill the victim," as described in *McCoy*.  Howard also argued that the trial court erred in denying his request for a new attorney on the second day of trial, stating that the court's reasons for denying the request were "inadequate" because it did not directly address Howard, instead discussing the request with trial counsel.

¶22    The State, on the other hand, argued that *McCoy* was not applicable to the circumstances of this case due to the factual differences between the two

cases. The State also pointed out that trial counsel "scrupulously followed" the defense that Howard wanted until the time that Howard agreed to include the jury instructions for self defense and the defense of others, as well as those for the applicable lesser included offenses. Additionally, the State asserted that arguing self defense is not a concession of guilt, citing a number of cases from other jurisdictions. Furthermore, with regard to Howard's argument that the trial court erred in denying his request for new counsel, the State asserted that Howard had not demonstrated that there was good cause for the substitution of his trial counsel, and therefore the trial court did not err in denying his request.

¶23 The postconviction court denied the motion without a hearing. The court did not address Howard's argument relating to *McCoy*, but rather found that Howard was not prejudiced by the concession of his trial counsel during closing arguments under the *Strickland* analysis for assessing claims of ineffective assistance of counsel.[4] Regarding the denial of new counsel, the court agreed with the State, noting that Howard "has still not offered any other reason which adequately supports his request." This appeal follows.

---

[4] *See Strickland v. Washington*, 466 U.S. 668 (1984).

## DISCUSSION

### I. Application of *McCoy*

¶24    We begin with Howard's assertion that the holding in *McCoy*—a recent decision by the United States Supreme Court—is applicable in this case.[5] The issue in *McCoy* was whether trial counsel can—over the objection of the defendant—concede that defendant's guilt.  *See id.*, 138 S. Ct. at 1505.  The Supreme Court held that doing so is a violation of the Sixth Amendment.  *Id.*

¶25    The premise for the *McCoy* ruling is that a defendant's rights under the Sixth Amendment to make "certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate."  *Florida v. Nixon*, 543 U.S. 175, 187 (2004).  These decisions include "whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal."  *McCoy*, 138 S. Ct. at 1508.  The *McCoy* Court determined that "[a]utonomy to decide that the objective of the defense is to assert innocence" also belongs in that category, as opposed to being in the realm of "[t]rial management," which is "the lawyer's province[.]"  *Id.*  The Court explained that such decisions "are not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*."  *Id.*

___

[5] We note that the rule stated in *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018), can be applied to this case retroactively, although this issue was not addressed by either party.  "Whether to retroactively apply the holding of a case is a question of law that we decide *de novo*."  *State ex rel. Krieger v. Borgen*, 2004 WI App 163, ¶7, 276 Wis. 2d 96, 687 N.W.2d 79.  The rule announced in *McCoy* is one of criminal procedure, which, unlike a substantive rule, "'do[es] not produce a class of persons convicted of conduct the law does not make criminal'"; instead, a procedural rule "'merely raise[s] the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise.'"  *Welch v. United States*, 136 S. Ct. 1257, 1265 (2016) (citation omitted).  In Wisconsin, "new rules of criminal procedure are to be applied retroactively to *all cases pending on direct review* or non-finalized cases still in the direct appeal pipeline."  *State v. Lagundoye*, 2004 WI 4, ¶12, 268 Wis. 2d 77, 674 N.W.2d 526 (emphasis added).

9

¶26 Furthermore, because the *McCoy* Court distinguished a decision grounded in "a client's autonomy" from trial strategy where trial counsel's "competence" is reviewed, the Court declared that an analysis for ineffective assistance of counsel using *Strickland* was not applicable. *McCoy*, 138 S. Ct. at 1510-11. Rather, the Court deemed such a violation to be a structural error, with the remedy being a new trial "without any need" for a defendant to first show prejudice. *Id.* at 1511.

¶27 The *McCoy* Court reviewed trial counsel's actions in a capital case: the defendant was accused of committing three murders, for which the government was seeking the death penalty. *Id.* at 1505. The defendant "vociferously insisted" he had not committed the crimes, even though there was "overwhelming" evidence to the contrary. *Id.* at 1505, 1513. Despite the defendant maintaining his innocence throughout the trial, during the guilt phase of the trial, trial counsel told the jury that the defendant had "committed three murders…. [H]e's guilty." *Id.* at 1505 (ellipses and brackets in *McCoy*).

¶28 The Court recognized that the defendant in *McCoy* had "opposed [trial counsel]'s assertion of his guilt at every opportunity, before and during trial, both in conference with his lawyer and in open court." *Id.* at 1509. Thus, trial counsel knew of the defendant's "'complet[e] oppos[ition]'" to a concession, because he continued to "press[] [trial counsel] to pursue acquittal" throughout the proceedings for the guilt phase of the case. *Id.* at 1506 (first two sets of brackets in *McCoy*). In fact, the defendant "testified in his own defense, maintaining his innocence and pressing an alibi difficult to fathom." *Id.* at 1507. Nevertheless, trial counsel conceded the defendant's guilt in both his opening statement and closing argument, characterizing the State's evidence as "unambiguous" that the defendant had committed the murders. *Id.* Indeed, he told the jury there was "'no way reasonably

possible' that they could hear the prosecution's evidence and reach 'any other conclusion than Robert McCoy was the cause of these individuals' death[s].'" *Id.* at 1506.

¶29  As Howard points out, there are some similarities between his case and the fact set in *McCoy*.  Throughout most of the proceedings, Howard's trial counsel noted a number of times on the record that he wanted to pursue self defense or defense of others as a strategy, which differed from Howard's theory of defense, which was that he was not there at the time Vincent was stabbed.

¶30  Additionally, like Howard, the defendant in *McCoy* sought to replace his trial counsel due to the disagreement over the defense's theory, although in *McCoy* this request occurred two days prior to the commencement of the trial, *see id.*, as opposed to two days into trial as in Howard's case.  The trial court in *McCoy* also refused to grant the request, indicating that it was a strategic decision of counsel to determine whether to pursue a defense during the guilt phase of a capital trial in accordance with the defendant's wishes, or concede his guilt in the face of overwhelming evidence and hope for mercy during the death penalty phase of the case.[6] *Id.* at 1506-07.  The trial court here made similar remarks regarding the jury instructions at issue, stating that the request for instructions was "a trial strategy decision ultimately," and "certainly not a decision of constitutional proportions," such as the decision about whether to testify.

¶31  However, the facts of these cases differ in one important way:  here, Howard eventually agreed to the inclusion of the self defense and defense of others

---

[6] The *McCoy* Court indicated that its decision applies when a defendant's "individual liberty—and, in capital cases, life—[is] at stake[.]" *Id.*, 138 S. Ct. at 1505.  We construe this to mean that the principles announced in *McCoy* are applicable to all criminal cases, not just capital cases.

instructions, and the inclusion of the lesser included offenses related to those instructions. This occurred after the State rested, when the strength of its case could be evaluated based on the evidence that had been admitted. Thus, Howard's agreeing to the inclusion of those instructions could be interpreted as Howard choosing an alternative defense objective in the face of the strong evidence against him presented by the State.

¶32 Still, in his postconviction motion, Howard alleges that his acquiescence to the inclusions of those instructions was due to his trial counsel telling him that counsel "would move forward with these defenses even if Mr. Howard did not agree with him." Howard further alleges that the inclusion of these instructions—whereby self defense was thus pursued as the defense's theory—affected his decision not to testify.

¶33 Howard seeks an evidentiary hearing regarding this claim. A defendant is not automatically entitled to an evidentiary hearing relating to his or her postconviction motion. *State v. Bentley*, 201 Wis. 2d 303, 309, 548 N.W.2d 50 (1996). Rather, the postconviction court is required to hold an evidentiary hearing only if the defendant has alleged "sufficient material facts that, if true, would entitle the defendant to relief." *State v. Allen*, 2004 WI 106, ¶14, 274 Wis. 2d 568, 682 N.W.2d 433. This is a question of law that we review *de novo*. *Id.*, ¶9.

¶34 The record generally supports Howard's allegations; the disagreement regarding strategy between Howard and his trial counsel was noted several times throughout the proceedings, until the end of trial when Howard acquiesced to allowing the instructions. This ultimately led to trial counsel conceding during his closing argument that Howard had killed Vincent in self defense. This sequence of events could be indicative of a violation of Howard's constitutional right to choose

his defense objective without having trial counsel "override" that decision, as set forth in *McCoy*. *See id.*, 138 S. Ct. at 1509.

¶35 Therefore, we conclude that Howard has pled sufficient material facts in his postconviction motion to entitle him to an evidentiary hearing regarding the application of the *McCoy* ruling. *See Allen*, 274 Wis. 2d 568, ¶14. As a result, we remand this matter to the postconviction court to conduct a hearing for further fact finding to determine whether the principles of the *McCoy* ruling were violated.

## II. Howard's Request for New Counsel

¶36 Howard also seeks a retrospective evidentiary hearing with regard to his request for new counsel on the second day of his trial. "Whether trial counsel should be relieved and a new attorney appointed is a matter within the [trial] court's discretion." *State v. Jones*, 2010 WI 72, ¶23, 326 Wis. 2d 380, 797 N.W.2d 378. As with our review of other discretionary determinations, we will not disturb this discretionary decision of the trial court if that court "examined the relevant facts, applied a proper legal standard, and reached a reasonable conclusion using a demonstrated rational process." *See State v. Mayo*, 2007 WI 78, ¶31, 301 Wis. 2d 642, 734 N.W.2d 115.

¶37 Our review of the trial court's decision to deny Howard's request for new counsel "'must consider a number of factors[.]'" *Jones*, 326 Wis. 2d 380, ¶25 (citation omitted). The factors that must be considered include

> (1) the adequacy of the court's inquiry into the defendant's complaint; (2) the timeliness of the motion; and (3) whether the alleged conflict between the defendant and the attorney was so great that it likely resulted in a total lack of communication that prevented an adequate defense and frustrated a fair presentation of the case.

*Id.* (citation omitted).

¶38     Howard's request for a new attorney came at the beginning of the second day of trial, in the form of an "outburst" in court, outside the presence of the jury. Howard's trial counsel explained Howard's issue, with additional comments interjected by Howard. Howard had informed counsel the day before—the first day of trial—that he wanted counsel to submit a motion to suppress his recorded statement to the police. Howard stated during this exchange that the reason he sought a suppression motion was that the police had "tricked" him into confessing to stabbing Vincent. Trial counsel explained that there were no grounds for a suppression motion, so he did not file one.

¶39     In applying the factors required for consideration, we note that making such a request on the second day of trial will generally not be deemed to be timely. Additionally, there is no indication in the record that there was a complete breakdown in communication between Howard and his trial counsel.

¶40     Rather, Howard argues that the trial court's ruling was erroneous because it was inadequate, in that the court failed to "actually address" Howard, instead hearing only from trial counsel. This is not entirely accurate, however, since Howard was involved in the exchange with the trial court regarding his request. Furthermore, the basis for Howard's request at that point in time was that his trial counsel refused to file a suppression motion as demanded by Howard, because counsel had deemed it to be frivolous.

¶41     Yet, the trial court was aware at that time that Howard and his trial counsel were at odds over the theory of defense. Although the suppression motion was the apparent reason for Howard's request, a more thorough inquiry by the trial court may have uncovered further information relating to the depths of their

disagreement over the theory of defense. Accordingly, the evidentiary hearing to be held regarding trial counsel's conduct relative to the principles of *McCoy* should include further inquiry into this claim.

¶42    Therefore, the order of the postconviction court is reversed, and this matter is remanded for an evidentiary hearing that shall include inquiries into both of Howard's claims as they relate to the principles set forth in *McCoy*, as described in this opinion.

*By the Court.*—Order reversed and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2017-18).